914 F.2d 247
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
James R. BUTLER, Plaintiff-Appellant,
v.
ACADEMY INSURANCE GROUP, INC., Academy Life Insurance Co.,
Pension Insurance Group of America, Inc., Pension
Life Insurance Company of America,
Defendants-Appellees.
 No. 88-2600.
 United States Court of Appeals, Fourth Circuit.
 Argued Nov. 1, 1989.
Decided Sept. 17, 1990.
As Amended Oct. 25, 1990.
 
 Thomas C. Salane, Turner, Padget, Graham & Laney, P.A., Columbia, S.C., (Argued), for appellant, C. Ansel Gantt, Jr., Allen & Gantt, Columbia, S.C., on brief.
 James W. Crabtree, Smathers & Thompson, Charlotte, N.C., (Argued), for appellee; Charles E. Baker, Belser, Baker, Barwick, Ravenel, Toal & Bender, Columbia, S.C., on brief.
 Before DONALD RUSSELL, Circuit Judge, BUTZNER, Senior Circuit Judge, and JOSEPH H. YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 PER CURIAM:
 
 
 1
 The appellant, James R. Butler, was the "managing general agent" of European Operations for the Academy Insurance Group ("Academy")[1] until April of 1986. In that position, he oversaw the insurance agents that represented Academy in Europe. As part of Butler's position, he could make monetary advances of Academy monies to agents and recoup these funds from commissions later earned by the agents serving under him. Butler was personally liable for those advances that he did not recover. When Butler left the European position, questions arose concerning the extent of Butler's liability for advances he had authorized and whether certain commissions earned by the European agents would be applied towards those past advances. That controversy resulted in this lawsuit, with Butler suing for unpaid commissions due him, and with Academy counterclaiming for advances made by Butler that were not covered by commissions. Academy won a judgment below, and Butler appeals on three grounds. First, Butler maintains that the district court misconstrued the contractual arrangement between the parties. He argues that he is entitled to more credit for premiums earned after his departure than the district judge awarded him. Second, he argues that the district judge erroneously calculated the amounts owed by Butler regardless of any misinterpretation of the parties' contractual relationship. Finally, Butler maintains that the district judge denied him the opportunity to confront and cross-examine certain evidence presented by the defendants. We vacate the judgment of the district court, affirm disposition of issues raised in Butler's complaint, and remand for limited proceedings with respect to the company's counterclaim.
 
 
 2
 * Butler is a former major in the United States Army. He retired from the service in 1971 and took a position with Academy as an insurance salesman. Academy markets insurance policies primarily to military personnel and their dependents. During Butler's tenure with Academy, he rose through the ranks and eventually became the "Managing General Agent" ("MGA") for Europe in January 1982. Butler held this position until April 1, 1986, when he resigned and was replaced by Monte Dennett.
 
 
 3
 As MGA, Butler was authorized to hire "General Agents" and "Agents" to work in his territory. General agents were responsible for the recruiting, training, and supervision of agents, who actually sold the insurance policies. The MGA oversaw the whole operation for the region. Agents, general agents, and MGAs all received commissions based upon insurance policies sold. When an agent sold a policy, he earned a commission, as did the general agent who hired the agent and the MGA. These commissions were composed of a certain portion of the premium payment on the policy. These commissions accrued and were paid out over several years according to various formulas. In addition, these commissions vested to those agents who earned them.
 
 
 4
 Butler has held the positions of agent, general agent, and MGA at various stages of his career with Academy. Thus, although he left Academy as an MGA, he was entitled to commissions earned in each of these three positions, since those positions would pay commissions over time. Because this case involves determining who owes whom money, we must briefly explain this commission structure. An agent who sold a policy in America, for example, would earn a commission of 50 percent of the first year's policy premium plus a renewal commission of 5 percent of premiums paid for the second through tenth year of the policy's life. Thereafter, for each year the policy continued in force, the agent earned a "service fee" of 2 1/2 percent of premiums paid to Academy for the life of the policy. European agents were compensated slightly differently. They would receive 75 percent of the first year's premium and a renewal commission for the second year of the policy's life, but nothing thereafter.
 
 
 5
 As for a general agent, he would receive 30 percent of the first year's commission earned by any agent he had hired, trained, and supervised. If the general agent only performed some of these functions, a lesser percentage would apply.
 
 
 6
 The MGA would receive a commission of 20 percent of all first year commissions earned by agents recruited or assigned to him. The MGA also earned a renewal commission equal to one percent of all renewal business produced by the agents recruited by or assigned to the MGA for the second through the tenth years of the policy. After the tenth year, the MGA received an annual service fee of one-half percent of all policy premiums paid on the policies.
 
 
 7
 The MGA's entitlement to commissions could be set-off by any advances made by the MGA to agents working under him. The MGA would recover any advances from commissions later earned by his agents. Academy charged an interest rate of 10% on these advances. The MGA was personally liable for the advances he made to his agents. The judgment below entered against Butler represents a negative overall balance for his agents, meaning that the advances he made totaled more than his agents' subsequent commissions.
 
 
 8
 According to company practice, all commissions due an agent, a general agent, or an MGA were first paid into an escrow account and then paid to the agent, general agent, or MGA in periodic increments. Each agent had his own escrow account, and each account was assigned a unique number. That same account kept track of the advances made to the agent. If there was a negative overall balance in that account, the MGA was personally liable for it. When Butler resigned on April 1, 1986, each of the agents was given a new account number for his escrow account. Academy said that this took place because it wanted to give its new European MGA, Dennett, a "fresh start" in Europe.
 
 
 9
 This "fresh start" for Dennett was not accompanied by a clean break between Butler and Academy. Shortly after leaving, Butler initiated this suit, claiming that he was not being paid the commissions that were vested in him and due. Academy filed a counterclaim, alleging that the advances made by Butler were greater than the commissions earned on policies sold during Butler's tenure, and that Butler was liable for the difference. In his answer to the counterclaim, Butler denied the allegations of his indebtedness and asserted that the company had both overcharged his account and omitted credits from his agents.
 
 
 10
 After a bench trial, the district judge entered a judgment of $566,922.73 for Academy, finding that Butler's advances outstripped the creditable commissions by that amount.
 
 II
 
 11
 In order to make that ruling, the district judge had to determine the contractual relationship between Butler, Dennett, and Academy in regards to crediting commissions towards advances. Below, Butler maintained that he should be relieved of all of his liability for advances and that the new MGA should have assumed this liability. The district judge rejected this proposition. The contract provided that the MGA was responsible for any advances he made. Nothing in the agreement between Butler and Academy provided for the resolution of the debt of advances after the MGA's termination. Hence, there was no reason to abrogate Butler's liability for the advances merely because he resigned as MGA. On appeal, Butler has dropped this argument.
 
 
 12
 Butler also argued that a separate agreement he entered with Dennett established that commissions earned by agents still employed by Academy after April 1, 1986, should be applied towards his debt.[2] This alleged agreement was in the form of a memorandum:
 
 TO: Academy Life Insurance Group
 
 13
 I, the undersigned, do hereby assume liability and responsibility as Managing General Agent for all agents assigned to Academy and Pension Life Insurance Companies in Europe from James R. Butler effective April 1, 1986.
 
 
 14
 /s/ Monte M. Dennett
 
 
 15
 cc: James R. Butler
 
 
 16
 The trial court found that this memo does not allow Butler to have commissions earned by active agents after April 1, 1986, applied to the debt for which Butler is currently responsible. Butler has challenged this ruling on appeal. Yet he has not argued why the district court's construction of the Dennett memorandum was clearly erroneous. As noted by the district judge, the memorandum does not clearly state whether Dennett was agreeing to assume future liability or some unspecified present liability.
 
 
 17
 Both Dennett and Terry Beale testified that they understood that this memorandum only made Dennett liable for future debt. Terry Beale was also an MGA, and he assisted Dennett in the transfer of power from Butler to Dennett. Importantly, Butler also testified that he did not recall ever discussing with anybody a transfer of active agent debt from himself to Dennett. Given this testimony, the district judge's construction of the Dennett memorandum was not clearly erroneous.
 
 
 18
 The district judge held that Butler was entitled to receive credit only for commissions earned on policies sold before April 1, 1986. Thus, there would be some reduction in the advances owed by Butler after his resignation, since commissions would be earned over a period of years for policies sold before April 1 that continue in effect.
 
 
 19
 In the alternative, Butler argues that even if he is only entitled to credit for commissions earned on policies sold before April 1, Academy has failed to give him credit for any of these commissions. Butler claims that the change in the account number assigned to each agent occasioned by his resignation prevented him from receiving proper credit. Butler argues that the new account numbers essentially started each agent over with a new escrow account. Thus, any commissions earned after April 1, 1986, would be applied only to advances made after that date. If that is true, then Academy is depriving Butler credit for commissions earned after April 1 on policies sold before that date. Hence, Butler claims that when Academy gave Dennett a fresh start, it wrongfully did so at Butler's expense.
 
 
 20
 Academy responded that Butler received credit for commissions earned after April 1 on policies sold before that date. At trial, Academy demonstrated that the total sum due from Butler had been reduced since April 1, 1986, indicating that Butler had received some credit for commissions earned. At trial, Bruce Cimorelli, the director of Internal Audit for Academy, testified to the status of Butler's accounts. He stated that as of April 1, 1986, Butler was responsible for a total active agent debt in a principal amount of $792,464. As of July 1987 (which was one month before trial), the total active agent debt had been reduced to a principal amount of $334,096. Butler's debt was reduced, which contradicts Butler's hypothesis that he was receiving no credit towards his debt after April 1. The final judgment against Butler, $566,922.73, includes the $334,096 principal and interest. In addition, Cimorelli testified that he and others had spot-checked their computer's calculations to determine if Butler was receiving proper credit for commissions earned after Butler's resignation, and that the spot check found that proper credit was being given. Cimorelli also testified that he was confident his spot-check verified the accuracy of the computer's work.
 
 III
 
 21
 At the end of trial, the district judge posed certain written questions to both sides in an attempt to clear up the issue of damages. Butler claims that this procedure deprived him of his right to "cross-examine" Academy's responses.
 
 
 22
 The trial court conducted a bifurcated proceeding, first on liability, then on damages. At the end of the liability hearing, without deciding the issue, the trial judge ordered each side to submit responses to certain questions posed by the court. The purpose of this order was to determine what figures each side advocated for the relevant amounts, such as the amount of advances, the contributions credited toward advances, etc. In addition to submitting its own responses to these questions, Butler submitted rebuttal answers which criticized Academy's answers to these questions.
 
 
 23
 Butler maintains that this was an insufficient opportunity to dispute Academy's figures. Butler argues he should have been given an opportunity to cross-examine the author of Academy's figures so that the true basis of these figures could be analyzed and the results challenged. The parties' answers to the judge's questions, Academy's affidavit for its counterclaim, and Butler's objections to the affidavit disclose a number of genuine issues of material fact. Particularly, Butler contended that he had not received credit for all commissions earned on policies written prior to April 1, 1986. Nevertheless, the judge proceeded to adjudicate the amount of the counterclaim without a further evidentiary hearing. In effect, the judge granted summary judgment on this aspect of the case, accepting Academy's evidence and crediting its officer's affidavit without affording Butler an opportunity to cross-examine the officer on his affidavit and the account that he prepared.
 
 
 24
 We conclude that the court's summary adjudication of the company's counterclaim deprived Butler of an opportunity to cross-examine in order to expose the error, if any, in Academy's submission after the evidentiary hearing had been completed.
 
 IV
 
 25
 Butler claims that another means of satisfying the debt carried by many agents was improperly taken from him by Academy. According to his contract with Academy, Butler had authority to retain local counsel to sue terminated agents with negative account balances for the amounts that they owed. Yet the attorneys hired by Butler would be representing Academy, not Butler. Any sums recovered would be used to lower or eliminate the deficit in that agent's account. When these agents were sued by Butler, they would often file counterclaims for wrongful termination. Because of these counterclaims, Academy assumed control over all litigation. It then forgave these account debts in order to get releases on the counterclaims, and decided that no more agents would be sued because they might file counterclaims also. Hence, a means for Butler to eliminate the debt was taken from him, yet he was still liable for the advances to those deadbeat agents.
 
 
 26
 On appeal, Butler argues that since Academy forgave these debts, it cannot look to Butler for satisfaction of them. Butler calls this principle "equitable subrogation." However, this argument was not raised below by Butler. In paragraph 44 of his complaint, Butler did allege that he was denied the right to sue his former agents. However, Butler alleged that this constituted an intentional interference with contract. The district judge dismissed this count. She held that since Academy actually employed the attorneys, not Butler, Academy could not have interfered with its own contract. Butler has not challenged this ruling on appeal.
 
 
 27
 Dismissal of Butler's claim for damages based on intentional interference of contract does not, however, dispose of his allegations contained in the answer to Academy's counterclaim. In that pleading Butler asserted that Academy included in his account sums for which he was not liable. The intentional interference with contract cause of action, which the district judge properly dismissed, dealt with Butler's contention that he had hired the lawyer to collect delinquent accounts from agents. The response to the counterclaim is based on a different theory, namely, that Academy discharged the agents from liability on advances and then transferred their delinquencies to Butler, holding him responsible for the agents' advances.
 
 
 28
 The district judge made no findings on this issue, believing that dismissal of the interference of contract claim fully disposed of Butler's defense to the counterclaim. On remand the district court should make findings and state its conclusions on this issue. Whether the defense to the counterclaim is called "equitable subrogation" or simply a failure to credit what Butler claims is due is of little moment. Butler alleged the defense and introduced evidence to support it.
 
 V
 
 29
 We vacate the judgment of the district court and remand the case for limited proceedings in accordance with this opinion. On remand Butler cannot reopen the issues the district judge decided against him on his complaint. Remand is limited to determining the amount the company can recover on its counterclaim. The district judge should allow Butler to introduce evidence and cross-examine witnesses on the question whether he has received proper credit for commissions earned on policies issued prior to April 1, 1986, and, if not, the amount of those commissions. The district judge should also make findings and decide whether the company exonerated agents who owed advances while at the same time charging Butler with the exonerated advances. Depending on the outcome of the hearing on remand, the district court should either reduce the counterclaim or re-enter judgment for the sum it previously found. The company having substantially prevailed shall recover its costs.
 
 
 30
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.
 
 
 
 [1]
 Actually, there were five defendant entities below, not just the Academy Insurance Group, Inc. Each of the entities is either related by merger or subsidiary status. However, there is no need to distinguish between these five companies for the purposes of this appeal. Thus, these entities shall be collectively referred to as "Academy." For the record, these are the five defendant companies: Academy Insurance Group, Inc., Academy Life Insurance Co., Pension Insurance Group of America, Inc. and Pension Life Insurance Company of America
 
 
 [2]
 On appeal, Butler concedes that he is liable for the debt of advances owed by agents whose relationship with Academy has been terminated